## IN THE MATTER OF THE APPLICATION OF JAMES G. FOR ADMISSION TO THE BAR OF MARYLAND

[Misc. No. 1 (Adv.), September Term, 1983.]

*Decided August 4, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Richard A. Buddeke* on behalf of applicant.

Murphy, C. J., delivered the opinion of the Court. Smith and Rodowsky, JJ., dissent. Smith, J., filed a dissenting opinion at page 317 *infra,* in which Rodowsky, J., concurs.

Whether the applicant in this case currently possesses the requisite moral character that would justify his admission to the Bar of Maryland is the issue before us for determination.

Because of applicant's past criminal record, the Character Committee for the Third Judicial Circuit held a hearing on October 21, 1980, pursuant to Rule 4 of the Rules Governing Admission to the Bar of Maryland. The Committee recommended unanimously to the State Board of Law Examiners that the applicant not be admitted to the Maryland Bar. The Board subsequently conducted an evidentiary hearing on November 2, 1981. By a divided vote (3-2), the Board recommended to the Court that the applicant be admitted. We considered the matter at a hearing at which the applicant appeared and spoke on his own behalf. Because we conclude that the evidence is clear and convincing that the applicant has been completely rehabilitated and possesses present good moral character, we shall order his admission.

The applicant resided with his family in Chevy Chase, Maryland, for the first fifteen years of his life, then in Bethesda for four years, after which he moved to Baltimore in 1964, when the applicant was nineteen years of age. Although reared under relatively favorable economic conditions in affluent residential areas, the quality of applicant's home life was far from ideal. His parents, both of whom were attorneys, argued constantly, frequently escalating to a point of physical confrontation. Eventually, during 1959, there was a separation, apparently final, although no divorce action was initiated. Applicant, by his own choice, resided in his father's home until, in 1964, at age nineteen, he married.

Applicant's marital experiences have, similarly, been less

than storybook in character. A son of his first marriage was born with Down's Syndrome in October of 1964. His wife was murdered in 1967, during an apparent attempted robbery of the tourist home which they managed. The applicant's son ultimately was committed to institutional care as James was unable to provide proper care for him. The applicant remarried and has established a positive relationship with a stepson, although James and his second wife are currently separated.

During the six-month period from April to October, 1967, the applicant became involved in a series of bizarre criminal episodes which resulted in charges against him of conspiring to commit forgery, forgery and uttering, murder and accessory to commit murder, homicide and assault. The applicant pled *nolo contendere* to the charge of conspiracy to commit forgery of a bank check drawn by his mother, and, in September, 1968, he received a suspended sentence. He was found guilty of six counts of forgery and uttering arising out of the use of a misappropriated credit card and received a sentence of twenty months to five years incarceration. Full restitution was made prior to his arrest for this offense. Although arrested for murder and as an accessory to commit murder in the matter of the death of his first wife, the charges against James were dismissed without trial. Arrested on charges of homicide and assault arising out of a Halloween night stabbing of a gas station attendant by one of his companions, James was found not guilty. The applicant subsequently offered a plea of *nolo contendere* to simple assault, for which he received a suspended sentence.

The Halloween night stabbing incident occurred just after the applicant enrolled at the University of Baltimore Law School. As a result of his incarceration without bond until December, 1967, he was unable to continue at the law school. As a result of his conviction for forgery and uttering, James was incarcerated for twenty-one months from November, 1970, to August, 1972. The applicant earned a work-related commendation from prison officials during his incarceration and, from the time of his parole in August, 1972, until the

present, the applicant has not been involved in any criminal activity.

James has worked continuously at a variety of jobs while simultaneously attending college and law school. He graduated from the University of Baltimore Law School in 1980, applied for admission to the Bar of Maryland on May 17, 1980, and sat for and successfully passed the July, 1980, bar examination. He applied for admission to the Bar of the District of Columbia and was admitted in that jurisdiction after successfully passing the February, 1981, Bar examination. Prior to admission, James' present moral character fitness was favorably considered by the District of Columbia authorities. James has been actively practicing in that jurisdiction without incident for over two years since his admission.

We have said that no litmus test exists by which to determine whether an applicant possesses the good moral character requisite for admission to the Bar of Maryland. *In re Application of A.T.,* 286 Md. 507, 408 A.2d 1023 (1979); *In re Application of David H.,* 283 Md. 632, 392 A.2d 83 (1978). We summarized the analysis which must be undertaken in such a determination in *In re Application of Allan S.,* 282 Md. 683, 387 A.2d 271 (1978). In that case, the applicant for admission had been arrested twice, once in 1966 for stealing a bottle of rum and again in 1971 for stealing a tape measure. After a hearing, the Character Committee concluded that the applicant had met the burden of proving that he was presently possessed of good moral character and recommended that he be admitted to the Bar of Maryland. The Board of Law Examiners, however, came to the contrary conclusion following a hearing and recommended that he not be admitted.

In the course of our determination that the applicant possessed the requisite moral character fitness for admission, we said:

> "Where, as here, an applicant for admission to the Bar is shown to have committed a crime, the nature of the offense must be taken into consideration in

determining whether his present moral character is good. . . . Although a prior conviction is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation. . . . Thus, a prior conviction must be taken into account in the overall measurement of character and considered in connection with other evidence of subsequent rehabilitation and present moral character. . . . It is not without significance in this regard, as bearing upon moral fitness, that an applicant for admission to the bar refuses to admit his criminal conduct. . . .

The ultimate test of present moral character applicable to original admissions to the Bar, is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion. . . . That the absence of good moral character in the past is secondary to the existence of good moral character in the present is a cardinal principle in considering applications for original admission to the Bar." *Id.* at 690. (Citations omitted.)

In applying these principles to the facts in *Allan S.,* we said:

"[A]pplicant's first offense occurred in 1966, eleven years prior to the hearing before the Board; the 1971 offense occurred almost seven years prior to that hearing. While there can be no doubt that each of these offenses, though petty in nature, involved moral turpitude, the applicant readily admitted that he committed the crimes even though he was never tried or convicted of either of them. In this

respect, he was most candid with the Board and we cannot agree, in view of the record in this case, that the applicant did not admit that his acts were morally wrong and indefensible. On the contrary, he did so repeatedly, both before the Character Committee and the Board, and we are satisfied that he is deeply distressed that he participated in such conduct.

In undertaking to prove his good moral character, the applicant was largely limited to the production of opinion evidenced by those who know him. And letters attesting to his good character are entitled to respectful consideration. . . . The record before us contains letters from a number of members of the legal and lay community, all to the effect that the applicant presently possesses the good moral character required of a member of the Maryland Bar. One letter, from a former Securities Commissioner of Maryland, for whom the applicant has worked as a law clerk, contains a particularly strong endorsement of his present good moral character and he testified to the same effect at the hearing. Other similarly impressive expressions of unqualified trust in applicant's moral character are also in evidence.

There was no evidence in the record even remotely suggesting that the applicant has been involved in any misconduct in the years following the 1971 theft offense. The inference to be drawn is that during this interim period there has been a decided improvement in the applicant's conduct and behavior." *Id.* at 691-92. (Citations omitted.)

On the basis of the evidence presented, we held that Allan S. met the burden of proving his rehabilitation and present good moral character and we admitted him to the Bar of Maryland.

The principles enunciated in *Allan S.* have been applied in subsequent cases; *see, for example, In re Application of*

*G.L.S.,* 292 Md. 378, 439 A.2d 1107 (1982); *In re Application of A.T.,* 286 Md. 507, 408 A.2d 1023 (1979); *In re Application of David H.,* 283 Md. 632, 392 A.2d 83 (1978). In arriving at our own evaluation of the applicant's present moral character, we note that his criminal offenses all occurred within a six-month period in 1967, sixteen years ago, when the applicant was twenty-one years of age. A substantial and significant amount of time has thus passed since the criminal conduct occurred.

There can be no doubt that the applicant's criminal transgressions were serious and involved moral turpitude. The applicant has readily admitted his responsibility for and his participation in the crimes in which he was involved and his remorse is fully evident and genuine.

There are numerous letters in the record from members of the legal and lay community which evidence James' rehabilitation, all attesting to the fact that he is presently possessed of good moral character. Business associates and former employers, in particular, have high praise for the applicant and hold him in high esteem. A member of the District of Columbia Bar with whom the applicant shared office space testified before the Board of Law Examiners in regard to the applicant's trustworthiness:

"Q.  Do you personally trust him?

A.  Definitely, I trust him with anything he desires. He has the use of my office, all the equipment. There's money laying around the office, bonds. I have in my safe certificates of deposit and what have you. He has access to it, goes in the safe. He has no problem there whatsoever, I trust him implicitly, yes."

In addition, the record indicates that the applicant has been ethically discharging his duties as an attorney and member of the District of Columbia Bar for over two years.

Giving due consideration to the nature of the offenses for which the applicant was convicted, the time of their commission, the circumstances involved, the fact that the burden

rests upon the applicant to prove his good moral character, and, most importantly, the convincing evidence of the applicant's rehabilitation, we think he has established that he has the present good moral character to permit him to be granted the privilege of admission to the Bar of Maryland.

*It is so ordered.*

*Smith, J., dissenting:*

In this case my colleagues and the majority of the Board of Law Examiners have overriden the unanimous finding of the Character Committee for the Third Judicial Circuit that this applicant is not possessed of the moral character requisite for admission to the Bar of Maryland. I shall deal more fully with applicant's past criminal conduct than has the majority.

Applicant was born October 11, 1945. As the majority notes, he comes from no deprived background. Both of his parents are lawyers. He married April 2, 1964. He had one child before he was graduated from one of our institutions of higher learning in May 1967. He entered law school that fall. About the time that he was graduating from college and entering law school he apparently began to have difficulty in molding his acts to the established mores of society.

The State Board of Law Examiners described the first incident:

"In March 1967, Applicant, his sister, Janet . . . , and one Nancy . . . , conspired to forge the endorsement on a check in the amount of $1600. According to the Applicant, his mother owed Janet . . . that amount and had drawn a check on the Old Line National Bank. Applicant persuaded his sister to give him the check. He then enlisted Nancy . . . to open a savings account at Suburban Trust Company in the name of Janet . . . and to deposit the $1600 check.

"Applicant furnished [Nancy] with his sister's motor vehicle operator's license and social security card for identification. [Nancy] endorsed the check 'Janet ...' and deposited it. After the check had cleared, Applicant then had [Nancy] withdraw $1590 from the account in the form of a treasurer's check. [Nancy] was to receive $100 for her services. Several days later, Janet ... reported to Old Line National Bank that the $1600 check given her by her mother had been lost or stolen. [Nancy] turned the money over to Applicant.

"Upon investigation by the police, and with the apparent cooperation of Nancy ..., Applicant was arrested on August 26, 1967 and indicted in Montgomery County for conspiracy to forge a bank check. He subsequently pleaded nolo contendere to the charge and received a suspended sentence on September 26, 1968, thirteen months after the event."

The applicant explained when he appeared before the Character Committee:

"Q The check cleared the bank?

"A Yes, the check had cleared the bank from my mother. As a matter of fact, what had happened was Nancy ... opened up an account and, as a matter of fact, for the purpose of letting it clear, because we knew walking in with a $1,600 check to a girl at about, I guess, 18 or 19, probably wouldn't be cashed, so she opened up an account and let the check clear. After it cleared, she then withdrew the money.

"Q And gave it to your sister?

"A She gave it to me, initially. I gave Nancy a hundred dollars for doing it.

"Q And gave the rest —

"A To my sister. In waiting, although I wanted to be so nice in waiting — nice is the wrong word —

but waiting for them to recredit it with my mother and have my mother give my sister a check and —

"Q (Mr. Bounds) And you were going to get your share then?

"A That's correct.

"Q (Mr. Zink) In order for that to happen, somebody would have to indicate the forgery had been made on the check. Normally, that would involve, I suppose, your sister going to your mother and saying the check had been lost or something and saying that's not my signature, have your mother go back to the bank, unbeknownst to her as to what was going on, and request the bank to recredit the account?

"A My mother did that, but they then investigated, you know, they sent a policeman out and investigated the case and it sounded preposterous to him, rightfully so, the $1,600 check along with everything, I.D.'s missing the exact instance my sister, Jan, is supposed to be down in Florida on vacation, and the timing was preposterous. He advised, I believe it was Suburban Trust, not to pay off on the claim.

"Q Your mother didn't insist it be paid off?

"A Not when she found out what happened.

"Q So the investigation by the Police Department and the coming to light of the facts was almost simultaneous, I assume?

"A Yes, sir, although the arrest, as you can see, took place about, roughly, four months later."

Applicant was convicted in the United States District Court for the District of Columbia and incarcerated as a result of a scheme in which purchases were made on a misappropriated credit card. The presentence report indicates that this misappropriation took place in April 1967. The Board of Law Examiners said of that incident:

"At about the time Applicant was conspiring to defraud the Bank in the $1600 scam, the same Nancy . . . , who was an employee of Sears, Roebuck & Co., came into possession of a Sears credit card issued to one Charles Bailey. According to Applicant 'she came into possession of a credit card made out to a Charles Bailey because, due to a computer error, two of them were sent to Mr. Bailey and he returned one. She got a credit card and approached me on the idea of charging it up.' Applicant used the card to charge $1854 in Sears merchandise, some of which he gave to [Nancy]. The Applicant forged the name of Charles Bailey each time he used the credit card and frankly admitted he was 'trying to get as high a figure as possible. . . .'

"It wasn't until January 26, 1968 that Applicant was arrested by the District of Columbia police and charged with forgery and uttering in connection with the misuse of the Sears credit card. He was released on bond the same day. He was not tried until April 28, 1969 at which time he was found guilty on five counts of forgery and uttering. He was sentenced on June 27, 1969 to twenty months to five years in prison at the Lorton, Virginia correctional complex. His actual incarceration began on November 23, 1970, following appeal. The record discloses that restitution was made prior to his arrest for this offense."

The reported opinion on his appeal states that he was convicted on not five but six counts of forgery and uttering. It is of interest to this member of the Court that although the presentence investigation recommended probation, in its comment upon applicant's desire to become a lawyer the observation was made, "[I]t seems unlikely to us that he would be accepted by a bar." It is obvious that the trial judge did not deem probation as proper in applicant's case.

Yet another incident was related by the Board of Law Examiners:

"On July 15, 1967, Applicant was charged with disorderly conduct arising from an incident which occurred at the Millersville, Maryland police station. According to the Applicant, he had entered into the station to recover a jacket belonging to a friend. He apparently became annoyed because the officer in charge did not immediately give him the jacket and, after an exchange of words, Applicant was arrested and was placed on bond and the charge was ultimately dismissed. The record discloses no official disposition."

This incident would have no significance in my evaluation of his character but for the fact that he gave the name of his brother when he was arrested rather than his own.

The final incident in 1967 led to his conviction in the Circuit Court for Baltimore County. The Board of Law Examiners summarized that incident:

"Late on the night of October 29, 1967, Applicant and three friends were returning home from a Halloween party when their vehicle experienced mechanical difficulties. The driver, one Michael Pohling, drove into a service station where he became involved in an altercation with the attendant which resulted in a stabbing of the attendant by Pohling. During the altercation, Applicant got out of the car and waited on several customers and apparently made some effort to break up the argument without success. Applicant, Pohling and their friends left the scene of the stabbing but were arrested approximately a mile from the scene when the car again malfunctioned. The Applicant was in possession of the knife when he was arrested.

"In recounting how he came into possession of the knife, Applicant said: 'After Lew stabbed the guy and was going to throw away the evidence, I told him to give it to me and when the police found it, rather than throw it away, I had it in my blue dress shirt pocket and it was sticking there.'

"He reasoned that if the police believed that Pohling stabbed the attendant but found the knife in possession of Applicant, that no one could be convicted of the crime. He stated '. . . it was all crazy and stupid and an obstruction, of justice to some degree, except I didn't say anything to the police. It was absolutely crazy.'

"Applicant, Pohling and the third occupant of the car were all charged with murder, assault and related charges and were incarcerated without bond until December 1967. Pohling was subsequently convicted of second degree murder and sentenced to twelve years in prison. Applicant was released on $500 bond in December 1967 and ultimately entered a plea of nolo contendere to simple assault for which he received a suspended sentence."

The applicant told the Character Committee that the knife in question was "at least eight inches" long. He indicated to the committee that although he "didn't say anything" he had in mind that his taking the knife would confuse the police.

A brief synopsis of the filling station incident is found in *Poling v. State*, 6 Md. App. 45, 250 A.2d 126, *cert. denied*, 255 Md. 743 (1969), where Judge Thompson said for the Court of Special Appeals:

"There was evidence from which the jury could have found:

"That Poling became involved in a bizarre argument with the operator of a filling station; that after having pushed the operator he, Poling, pulled a knife and stabbed the victim to death; and the victim had no weapon in his hand and was backing away from Poling at the time of the stabbing. There was some indication that money was stolen, but that evidence was not necessary to support the verdict of second degree murder." 6 Md. App. 46-47.

The trial judge in the knife incident (Turnbull, J.) referred the applicant to the court psychiatrist. The concluding sentence of that report states, "At this point both Dr. Lassen and I feel that although it is quite unlikely that James will be involved in a situation relating to homicide it is quite likely that he will find himself involved in some other difficulty." Dr. Lassen was the court psychologist associated with the psychiatrist. No later evaluation by a psychiatrist or psychologist is contained in the file before the Court.

The dissenting members of the State Board of Law Examiners observed in this case:

> "Applicant in 1967 at age 21, committed the crimes of conspiracy to forge a bank check, and forgery and uttering in connection with misuse of a credit card. These are, in our opinion, crimes committed through connivance, subterfuge and stealth, activities particularly undesirable in a lawyer. Because of the nature of these crimes the Character Committee, understandably questioned the validity of certain letters offered by applicant. Crimes such as these cast in doubt the truthworthiness of the perpetrator. To us, the nature of the crimes in this instance is analogous, to that in *In Re Application of K.B.,* 291 Md. 170 [, 434 A.2d 541 (1981),] rather than to that in *In Re Application of G.L.S.,* 292 Md. 378 [, 439 A.2d 1107 (1982)]. The temptations facing lawyers lead more often to crimes of stealth and subterfuge than to crimes of confrontation such as armed robbery. We are of the opinion that wrongdoing of this type requires closer scrutiny than other failings."

The majority of the Board of Law Examiners relied upon *In Re Application of G.L.S.,* 292 Md. 378, 439 A.2d 1107 (1982), where the court, over the objection of Judge Digges, Judge Rodowsky, and me, admitted to practice an individual who had been convicted of armed robbery. That was his only offense. In *In Re Application of K.B.,* 291 Md. 170, 434 A.2d

324

541 (1981), cited by the dissenters, we unanimously denied an application for admission to the Bar where, in his sole slip from grace, an individual had been convicted of mail fraud involving use of fictitious names in violation of 18 U.S.C. § 1342 (1976). Judge Rodowsky concluded that opinion for the Court by stating:

> "We glean from the record as a whole the very distinct impression that this applicant's past criminal problem resulted from the perceived necessity to maintain a desired level of social prestige which, in this case, involved operating a car, and from a willingness to risk violating serious criminal laws in order to do so. Every experienced practitioner knows of cases where an attorney has yielded to the temptation to 'borrow' clients' funds entrusted to him because of the pressure to maintain a certain social status while waiting for some fees to come in. It is because of the great risk to the public in admitting to the Bar one who has exhibited this serious character flaw that we require the evidence of present moral fitness to 'unequivocally demonstrate . . . full and complete rehabilitation.' *In re Application of David H., supra,* 283 Md. at 641, 392 A.2d at 88." 291 Md. at 181.

We have here not one instance but four instances of applicant's deceit. The service station incident, of course, involves more than deceit but deceit is a principal ingredient since he said he took the knife to confuse the police.

Given this man's record, I am unwilling to certify to the people of Maryland that he has the requisite moral character to handle the affairs of others.

I am authorized to state that Judge Rodowsky concurs with the views herein expressed.