687 A.2d 245

**In The Matter of the Application of John Curtis DORTCH for Admission to the Bar of Maryland.**

**Misc. No. 16, Sept. Term, 1996.**

Court of Appeals of Maryland.

Jan. 6, 1997.

Daniel A. Katz, Takoma Park, for Petitioner.

John Curtis Dortch, South Charleston, WV, pro se.

No argument on behalf of Respondent.

Argued before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

In this case we are called upon to decide whether to approve a candidate's petition for admission to the Maryland Bar even though he was convicted of second degree murder and related attempted robbery offenses. We do not decide that issue today, however, because we hold that the candidate's petition for admission is premature. We wish to make it clear that a candidate for admission to the Maryland Bar who has been convicted of a crime that would clearly necessitate disbarment must have, as a threshold requirement, at least served his or her sentence and must have been released from parole supervision for the offense before this Court will even consider his or her application.

## I.

In 1974, John Curtis Dortch masterminded a conspiracy to rob Columbia Federal Savings & Loan Association and assembled eight other people to help him to commit the crime. The robbery was scheduled to occur on September 20, 1974, and on

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, § 3A, he also participated in the decision and adoption of this opinion.

that day Dortch and one co-conspirator, John W. Bryant, parked approximately two blocks away from the bank and proceeded down the street. Dortch and Bryant were dressed as construction workers, and Dortch was carrying two loaded handguns and two loaded sawed-off shotguns in a bricklayer's bag.

As the two conspirators approached the bank, two plain-clothed police officers sitting in a parked vehicle called out and asked the conspirators to walk over to the car. Dortch later learned that the police had been informed about the impending robbery by a conspirator who had backed out of the conspiracy the day before the robbery attempt. The officers asked Dortch to hand over his bag to them. As Dortch handed over the bag, with the shotguns in a breech position, an officer grabbed one of the guns. The gun accidentally discharged and injured Dortch's eye. Bryant and Dortch fled during the commotion.

Both men had been wearing civilian clothes under their construction-work clothes. Dortch fled to a nearby building to discard his disguise, and he escaped. Bryant was apprehended in a nearby parking garage while trying to remove his disguise. The apprehending officer was 24–year–old Gail Cobb, a police officer in the Metropolitan Police Department of the District of Columbia. Cobb was alone with her revolver in her holster when Bryant, who had been standing with his hands against a wall, turned and shot Cobb in the heart. Cobb was one of the first female United States police officers to be killed in the line of duty. She was survived by a son.

Dortch was not present at the murder scene. He learned of Officer Cobb's murder sometime later that afternoon or evening from the WASHINGTON POST. Dortch quickly contacted an attorney and surrendered to the authorities. Dortch was charged with first degree felony murder, conspiracy to commit a felony and attempted armed robbery. Dortch later pled guilty to and was convicted of second degree murder, conspiracy to commit a felony and attempted armed robbery in the District of Columbia Superior Court. Dortch was sentenced

to serve fifteen years to life imprisonment. Dortch served fifteen years. He was incarcerated in United States Penitentiary, Lewisburg, Pennsylvania from 1975–1981, in Federal Correctional Institution, Ray Brook, New York from 1981–1988 and in United States Penitentiary, Atlanta, Georgia, from 1988–1990.

Before 1974, Dortch had no criminal arrests or convictions. Dortch was born on July 19, 1945 in Beaufort, South Carolina. While in high school, Dortch was President of the Student Council and was a member of the National Honor Society. He was the captain of the varsity football team and of the varsity basketball team. Dortch also played trumpet in the marching band and sang in the school choir. He was graduated from high school in 1963.

Dortch attended Howard University and received a Bachelor of Arts degree in History, with a double minor in Government and Business, in 1968. He was also a member of the Reserve Officers' Training Corps (ROTC) at Howard University. During the 1966–67 academic year, Dortch was selected as the outstanding cadet in his ROTC class and was designated a Distinguished Military Student. After graduation, Dortch was awarded a regular commission into the United States Army, and he volunteered to serve in Vietnam as an infantry officer. Dortch, who was injured while trying to save a fellow soldier in a firefight, earned several medals and honors during his brief military career. Dortch was medically retired and honorably discharged as a second lieutenant in 1969.

Dortch returned to the Washington, D.C. area after receiving his honorable discharge. He worked as a successful life insurance agent at the New York Life Insurance Company from 1969 until 1974. Dortch won many awards for his excellence in sales. Dortch was a member of the Million Dollar Round Table, and in one year, he led the Washington D.C. office in individual sales. In 1970, Dortch was elected President of the Mid–Atlantic Career Conference, and in 1971,

he received a national sales achievement award from the National Association of Life Underwriters.

In February 1974, Dortch left New York Life and founded a small operational holding company, JCD Enterprises. JCD Enterprises was a partnership of several professionals with varying areas of expertise. For several reasons, JCD Enterprises became overextended and risked failure in its first year. The company's initial capitalization was exhausted quickly, in part because the 10–15 employees of JCD Enterprises received pre-paid commissions while they were in training. Also, the employees' sales never lived up to Dortch's expectations. Dortch made economic commitments on behalf of JCD Enterprises based upon his incorrect estimate of revenues. In addition, the United States, at the time, was experiencing "stagflation," rampant inflation combined with high unemployment, which was caused, in part, by the Organization of Petroleum Exporting Countries' oil embargo.

Twenty of Dortch's personal friends were investors in JCD Enterprises, and each stood to lose an investment of $5,000 if the business failed. Because Dortch felt that the investors had placed their trust and confidence in him, he felt obligated to protect their capital investments. Dortch made legitimate efforts to obtain a capital infusion from investment bankers to no avail. Dortch believed that his efforts were being thwarted by racists, a belief strengthened by his recent experiences in Vietnam. Dortch believed that his requests for a loan were not being satisfied because JCD Enterprises was founded by African–Americans to promote economic strength in African–American communities. Dortch admits now that the only correct course of action at the time would have been to declare corporate bankruptcy. Instead, Dortch led a conspiracy to commit the armed robbery that resulted in his imprisonment.

Dortch was a model prisoner. He was a clerk in the hospital records room from August 1975 to June 1976. Dortch was then transferred, at his request, to the central dental lab, a facility that served all of the inmates in Lewisburg prison. Dortch earned an Associate's degree in dental technology from

Willamsport Area Community College and became a graduate assistant in the central dental lab. In April 1979, Dortch accepted a position as a clerk in the Chaplain's office, which paid considerably less than his position in the central dental lab. In the early 1980's, Dortch was hired as an accountant for UNICOR Federal Prison Industries, a 53 million dollar enterprise.

Dortch won several awards and a commendation while working at UNICOR. He was also featured in a local newspaper article that described him as one of the top five inmates working at UNICOR. Robert Mathews, a staff accountant at UNICOR who worked with Dortch, said of Dortch: "he is untiring in his willingness to help [others]," and "[h]e is respected and appreciated by both staff and inmates alike." Robert Nickerson, the business manager of UNICOR, who worked with Dortch daily for two years, said that Dortch was "very fair in his dealings with ... inmates and staff" and that he "always conducted himself in a most professional manner and treated everyone with respect." He described Dortch as "a person of honesty and integrity" and as "a great humanitarian."

Dortch's petition for parole was granted in March of 1990, the earliest eligibility date possible for someone convicted of his crimes. He was released from prison in April of 1990, the delay having been caused by the bureaucratic processing of paperwork. Since his release, Dortch has been on supervised parole, which requires him to file monthly written reports. He has successfully fulfilled all of his parole requirements. Dortch has had no criminal arrests or convictions since his conviction in 1975. Dortch has never petitioned the United States Parole Commission to be released from parole, but his parole officer, David A. Heard, took it upon himself to request that Dortch's parole status be changed to "unsupervised." The U.S. Parole Commission has not yet decided whether to grant Mr. Heard's request.

Upon his release from prison, Dortch began work as Business Administrator at Covenant Baptist Church. Dortch com-

puterized Covenant's accounting system and monitored the church's compliance with its annual budget of $250,000. He also began teaching adult Bible classes at Covenant. Dortch worked at Covenant full time until he began law school, and part time thereafter until his replacement was hired. The Pastor of the church, Reverend Dennis Wiley, said that he " 'sensed within [Dortch] a deep remorse for what he had done . . . and a sincere desire to make amends. . . .' " Rev. Wiley also "characterized [Dortch] as trustworthy, dependable, and 'just basically a very . . . good and honest person.' "

Dortch attended the District of Columbia School of Law from 1991 to 1994. During law school he was elected President of the Student Bar Association, where he was trusted to handle student activity fees, and he served as Lieutenant Governor for the Student Division of the American Bar Association for the Eleventh Circuit. Dortch was the Chairman of the Committee on Racial & Ethnic Diversity, and he received the Dean's Cup for leadership at the School of Law. Dortch was also elected by fellow students to speak at Commencement. Four professors at the law school and the school's Dean have said that they would not hesitate to recommend that Dortch be allowed to practice law, and they have specifically praised Dortch's leadership skills, honesty, conscientiousness, maturity, compassion, tirelessness, responsibility, accessibility, trustworthiness, energy, intellect and oral communication skills.

After receiving his law degree, Dortch accepted a position as a paralegal at the law firm of Hunt & Serreno in Charleston, West Virginia, where he works for Mark A. Hunt, a lawyer and a member of the West Virginia House of Delegates. Mr. Hunt met Dortch in law school and was impressed by Dortch's compassion toward a homeless classmate. Hunt hired Dortch as a paralegal without hesitation, and will allow Dortch to practice in Hunt's firm as an attorney once Dortch has been admitted to the Bar. Dortch has also been employed as an Adjunct Professor of Law at the D.C. School of Law, has volunteered with summer youth employment programs, and

has been active in his church. In addition, he devotes time to counseling African–American youths.

Dortch has passed the District of Columbia, West Virginia and Maryland Bar Examinations and has petitioned for admission in all three jurisdictions. Mr. Dortch's character references are exceptional. The people who have lent their support to Mr. Dortch in connection with his petitions for admission to the Bars of three jurisdictions include: two D.C. police officers, a probation officer, a parole examiner, an attorney, a law school Dean, three law professors and one law instructor, a reverend, a West Virginia Delegate and attorney, a retired D.C. Court of Appeals Chief Judge and others. The testimony of these witnesses was that Dortch is trustworthy, responsible, hard-working and deeply caring. Each gave Dortch his or her strong and heartfelt support.

The West Virginia Board of Law Examiners deadlocked 3–3 on Dortch's application for admission. The Hearing Examiner of the State Board of Law Examiners held another hearing on the matter to break the tie. The Hearing Examiner has recommended that Dortch be admitted to the West Virginia Bar. The Hearing Examiner found that Dortch "has accepted and complied with all punishments" imposed as a result of his crime and that he "has gone beyond what has been asked of him for the purposes of rehabilitation." The Examiner found that Dortch presently possesses the "good moral character . . . to practice law in the State of West Virginia" and that "Dortch's present good moral character outweighs his 20 year old criminal history." The West Virginia Board of Bar Examiners reviewed the Hearing Examiner's report and issued to Dortch a Certificate of Eligibility, which is, in effect, a recommendation that Dortch be admitted to the West Virginia Bar. The Supreme Court of West Virginia, however, remanded the Certificate of Eligibility to the Board of Bar Examiners and ordered the Board instead to file findings of fact and a recommendation by December 15, 1996. The Supreme Court of West Virginia will decide whether to admit Dortch sometime after the findings of fact and recommendation are filed.

The District of Columbia Board of Bar Examiners recommended that Dortch be admitted to the District of Columbia Bar. The District of Columbia Court of Appeals is holding its decision in abeyance pending a decision by this Court.

The Character Committee of the Court of Appeals of Maryland for the Sixth Judicial Circuit, a board of seven local attorneys, recommended that Dortch be admitted to the Maryland Bar by a vote of 6–1. The Committee noted that Dortch's criminal conduct took place 22 years ago and was an isolated event that was entirely out of character. The Committee also felt that

> "Dortch has been tested since his prison release and performed admirably. He has had to take the Bar a second time and he has had financial difficulties and periods of unemployment or difficulty in obtaining employment, none of which caused him to return to any criminal enterprises. While they may not measure up to the temptations one faces as a practicing attorney, they provide evidence of his present good character."

The Committee was impressed that Dortch was paroled at his earliest eligibility date and that Dortch had been candid and forthright in all of his dealings with the Committee.

Perhaps most important to the Committee's decision, however, was Dortch's exceptional references. The Committee was especially impressed that two police officers and a probation officer were willing to lend their support to Dortch and that Mr. Hunt, a West Virginia Delegate who is planning to run for the office of Attorney General on a "law and order platform," was willing to hire Dortch. For all of these reasons, the Committee stated, in conclusion: "[We] come[ ] away persuaded that Mr. Dortch has convincingly rehabilitated himself and does possess present good moral character and fitness to practice law in Maryland."

The Maryland Board of Bar Examiners adopted the report and recommendation of the Character Committee for the Sixth Judicial Circuit. The Board decided that a formal hearing was unnecessary because of the thorough investiga-

tion and report of the Character Committee. The Board did conduct an informal interview of Dortch, however, after which the Board stated that it was impressed with Dortch's sincerity and demeanor and recommended Dortch's admission to the Maryland Bar.

Dortch has petitioned this Court to accept the recommendation of the Maryland Board of Bar Examiners and to grant his petition for admission to the Maryland Bar.

## II.

Although it does not appear that the admissibility of an original applicant under parole supervision has been considered in this country, several jurisdictions have addressed the analogous situation of whether an attorney who has been disbarred may be readmitted while under parole supervision. In *In the Matter of the Disciplinary Proceeding against Gordon L. Walgren*, 104 Wash.2d 557, 708 P.2d 380, 381 (Wash.1985), the Supreme Court of Washington held that Walgren, who had been disbarred after being convicted on felony charges, could not be reinstated into the bar until he had successfully completed the conditions of his parole and had been finally discharged. The court explained that "[r]einstatement prior to the elapse of parole would not comport with the principle that a parolee is not to be accorded complete liberty and privilege prior to successful completion of parole." *Walgren*, 708 P.2d at 388.

> "A person on parole does not have the full panoply of rights. Parole is a state of conditioned liberty; a prison without walls. * * * A release on parole does not represent a pardon nor does it alter the criminal's sentence. Rather, it represents a less restrictive period during which criminals are offered the opportunity to prove they can reintegrate themselves into society without the imposition of the full prison sentence." (Citations omitted).

*Walgren*, 708 P.2d at 387. The court found that Walgren had overcome the weaknesses that produced his earlier misconduct, *Walgren*, 708 P.2d at 383–89, and held that he would be

admitted as soon as he was discharged from parole. *Walgren,* 708 P.2d at 388–89.

When called upon to decide the same issue, the United States District Court for the Eastern District of Michigan also held that an attorney who had been disbarred after being convicted on felony charges could not be readmitted to the bar while under parole supervision. *In re W. Otis Culpepper,* 770 F.Supp. 366, 374 (E.D.Mich.1991). The court primarily relied on the language of *Walgren,* quoted *supra, Culpepper,* 770 F.Supp. at 370, 373, but the court also found it significant that in the state of Michigan a person could not serve as a juror while he or she was on parole for a felony. *Culpepper,* 770 F.Supp. at 374. Thus, the court stated:

> "it would be a disservice to the public, to the practicing bar and this Bench to effectively say that, although a person is legally disabled, by virtue of his criminal conviction status, from serving as a juror, it is acceptable for him to serve as an officer of this court."

*Id.* In addition, the court was concerned with the potential conflict of interest, or appearance thereof, that might arise when Culpepper, a criminal defense attorney, was representing his clients because he would have an adversarial relationship with the Federal Probation Office, the agency that supervised his parole. *Id.; see In re Florida Board of Bar Examiners,* 341 So.2d 503 (Fla.1976)(holding attorney disbarred after felony conviction cannot be reinstated until civil rights have been restored, which implicitly precludes the admission of parolees).

Although this Court has not previously considered the original application of a parolee, we have considered the petitions of applicants who have previously participated in criminal activities or who have been convicted of crimes. In order to be admitted into the Bar of Maryland, every applicant must prove that he or she presently possesses the good moral character necessary for the practice of law. *See* Maryland Rules for Bar Admission 5(a). Anytime an applicant has engaged in criminal activity his or her moral character, under-

standably, is called into question. This Court has, nevertheless, admitted such applicants to the Maryland Bar. When deciding whether to admit applicants who have engaged in criminal activity, this Court's primary concern has been the applicants' rehabilitation.

In *In Re Application of Allan S.*, 282 Md. 683, 691–93, 387 A.2d 271, 276–77 (1978), this Court granted admission to an applicant who had twice been arrested for theft. Both charges were dismissed, but the applicant readily admitted his guilt to this Court. *In Re Application of Allan S.*, 282 Md. at 686, 687, 387 A.2d at 273. We stated:

> "Although a prior conviction is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation. * * * Thus, a prior conviction must be taken into account in the overall measurement of character and considered in connection with other evidence of subsequent rehabilitation and present moral character." (Citations omitted).

*In Re Application of Allan S.*, 282 Md. at 690, 387 A.2d at 275. After considering all of the surrounding circumstances and "most importantly, the convincing evidence of the applicant's rehabilitation," we held that the applicant possessed the present moral character required for admission to the Maryland Bar. *In Re Application of Allan S.*, 282 Md. at 692–93, 387 A.2d at 277.

In *In Re Application of A.T.*, 286 Md. 507, 516, 408 A.2d 1023, 1028 (1979), this Court granted admission to an applicant who had a seven-year history of various drug-related offenses. We stated that the test of present moral character "is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion." *In Re Application of A.T.*, 286 Md. at 514, 408 A.2d at 1027. After considering

all of the facts in that case and "most importantly, the convincing evidence of the applicant's rehabilitation," we held that the applicant possessed the good moral character required for admission to the Maryland Bar. *In Re Application of A.T.*, 286 Md. at 516, 408 A.2d at 1028.

This Court in *In Re Application of George B.*, 297 Md. 421, 422, 466 A.2d 1286 (1983), denied admission to an applicant who had been convicted of attempted armed robbery of a bank. We stated that a conviction for attempted armed robbery of a bank is a serious criminal transgression "requiring full and complete evidence of rehabilitation sufficient to clearly demonstrate the existence of present good moral character fitness for admission to the Bar of Maryland...." *In Re Application of George B.*, 297 Md. at 421, 466 A.2d at 1286. We held that, under the facts of that case, a six-year rehabilitative period following the applicant's release from prison was of insufficient duration to permit a finding of good moral character. *In Re Application of George B.*, 297 Md. at 422, 466 A.2d at 1286.

### III.

A person on parole is still serving a prison sentence, albeit, beyond the prison walls. *State v. Parker,* 334 Md. 576, 588, 640 A.2d 1104, 1110 (1994). We will not even entertain an application to admit a person to the practice of law when that person is still directly or indirectly serving a prison sentence for a crime so severe that disbarment would be clearly necessitated if the crime were committed by an attorney. We conclude that Dortch's petition for admission to the Maryland Bar is premature. Once Dortch is released from parole supervision, he can request that this Court assess whether he is eligible for admission to the bar. We shall not consider Dortch's petition for admission until that time.

We express absolutely no judgment, however, as to Dortch's admissibility after he is released from parole supervision. We in no way suggest that Dortch will be admitted after he is released from parole; neither do we suggest that his petition

for admission will be denied. We state only that this Court will not consider the petition of a candidate for admission to the Maryland Bar while he or she is under parole supervision for a crime that would clearly necessitate disbarment. Dortch's petition is therefore premature and is denied. He is free to file a new petition for admission if, and when, he is released from parole supervision.

*IT IS SO ORDERED.*

RAKER, Judge, concurring, in which RODOWSKY, Judge, joins.

Seventeen years ago, Judge Marvin Smith asked "Do my colleagues propose permitting convicted murderers to become Maryland lawyers since they have not killed anyone lately?" *In re Application of A.T.,* 286 Md. 507, 518, 408 A.2d 1023, 1029 (1979) (Smith, J., dissenting). The answer to that question is "maybe."

Today, the Court holds that because Petitioner, a convicted murderer of a police officer, is still on parole, his "petition is therefore premature and is denied. He is free to file a new petition for admission if, and when, he is released from parole supervision." Maj. op. at 389. In so holding, the Court suggests that if Petitioner's parole were to be terminated tomorrow, he *might* be admitted. In contrast, I would deny his petition for admission to the bar because he has not proven by clear and convincing evidence that he possesses the requisite present moral character to be admitted to the Bar of this State. *See In re Application of James G.,* 296 Md. 310, 314, 462 A.2d 1198, 1200–01 (1983). Six short years since Petitioner has been released from prison for second degree murder is an insufficient amount of time for us to find that he has satisfied his very heavy burden to establish that "he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion." *In re Application of Allan S.,* 282 Md. 683, 690, 387 A.2d 271, 275 (1978); *In re Application of George B.,* 297 Md. 421, 422, 466 A.2d 1286, 1286 (1983) (six years

between release from prison and application for admission is "of insufficient duration, considering the gravity of the offense committed"); *see also In re Polin,* 596 A.2d 50, 54 n. 5 (D.C.1991).

It appears to me that Petitioner has not accepted responsibility for the crimes for which he was convicted. In his application to law school, dated August 6, 1990, after he served 15 years in prison, he characterized his murder conviction as an "injustice," an "abortion of justice," and one that was based on perjurious testimony by police officers. Petitioner's response to question 39D on his application to law school is indicative of his lack of responsibility, and reflects the following:

Q. Describe a specific personal experience in which you were subjected to or witnessed some significant form of injustice. How did you deal with it? How do you think you should have dealt with it?

A. I am an ex-offender, and I have witnessed and experienced improprieties in the administration of justice. By virtue of a guilty plea, I was convicted of second degree murder, attempted bank robbery, and conspiracy, and I served fifteen years in prison. I did not kill anyone nor did I attempt to kill anyone nor was I present at the scene of the homicide, but the alleged factual basis for my plea was predicated upon the felony murder concept, which stipulates that each conspirator is equally accountable for every and anything that transpires in the furtherance of a felony, even though he may not participate in the overt act. The injustice that I suffered was at the hands of both the defense counsel, whom I paid in advance, and the prosecution which condoned, if not encouraged, the perjurious testimonies of the complaining officers.

However, I am not bitter, because I did break the law, but not to the extent to which I was charged and prosecuted. The bottom line is that I did break the law, and had not I broken the law, I would not have been vulnerable to an abortion of justice.

I need not restate the facts surrounding this horrendous crime, committed when Petitioner was almost thirty years of age. It is significant to note, however, that Petitioner was the mastermind of an eight-person conspiracy to rob the Columbia Federal Savings and Loan. He went to the bank, armed with two loaded, sawed-off shotguns and two loaded revolvers. Although it was the bullet of his co-conspirator that killed Police Officer Gail Cobb, Dortch was obviously prepared to use deadly force to accomplish the goals of his criminal venture.[1]

Dortch was convicted of felony murder, attempted bank robbery and conspiracy. He was sentenced to prison for fifteen years to life, and released on parole in 1990. He graduated from law school in May, 1994, and applied for admission to the Maryland Bar in December, 1994. The Board of Law Examiners referred Petitioner's application to the Character Committee for the Sixth Judicial Circuit. Following an evidentiary hearing, the Committee recommended, by a 6–1 vote, that Petitioner be admitted to the Bar of Maryland. The State Board of Law Examiners decided that a formal hearing on the record on his fitness to practice law was unnecessary and instead conducted an informal hearing.[2] *Cf. In re Polin*, 596 A.2d 50, 55 n. 7 (D.C.1991) (noting that when applicant has committed a felony or other serious crime,

---

1. Petitioner testified at the hearing before the Character Committee of the Court of Appeals of Maryland for the Sixth Judicial Circuit that he envisioned firing "at most a warning shot, if any at all, a warning shot or something to get people's attention." It is patently obvious that sawed off shotguns are particularly deadly when fired, are not used for the purpose of firing warning shots.

2. In my view, under the circumstances of this case, the Board of Law Examiners should have held a formal hearing. The mere fact that a convicted murderer produces exemplary character references and has not committed a criminal act since his release from prison does not warrant an informal, off-the-record hearing by the Board of Law Examiners. In fact, all this Court knows about Petitioner is the information he chose to present. For example, we know little, if anything, about the business operation he headed in 1974, and the facts surrounding the sale of securities, which, at oral argument, Petitioner indicated were unregistered.

committee should conduct an independent investigation into applicant's behavior). While the Board's finding that the applicant possesses the requisite moral character is entitled to great weight, this Court must make its own independent evaluation of the applicant's present moral character. *In re Application of Allan S.*, 282 Md. 683, 690–91, 387 A.2d 271, 276 (1978). The ultimate decision regarding admission to the bar rests with this Court. *Id.* at 689, 387 A.2d at 275.

I recognize that this Court has joined with the majority of States in holding that there is no *per se* rule excluding all convicted felons from the bar. *See* Maureen M. Carr, *The Effect of Prior Criminal Conduct on the Admission to Practice Law: The Move to More Flexible Admission Standards,* 8 GEO. J. LEGAL ETHICS 367, 382–83 (describing majority approach of a presumptive disqualification for bar applicants convicted of a crime). Nonetheless, I believe there are some crimes which are so serious that a *sufficient* showing of rehabilitation may be impossible to make. If any crime fits within that category, it is the murder of a police officer during the course of an attempted armed robbery of a bank. In this regard, the Supreme Court of New Jersey stated:

> An applicant's attitude and behavior subsequent to disqualifying misconduct must demonstrate a reformation of character so convincingly that it is proper to allow admission to a profession whose members must stand free from all suspicion. The more serious the misconduct, the greater showing of rehabilitation that will be required.... However, it must be recognized that in the case of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to make. In all cases, the need to ensure the legitimacy of the judicial process remains paramount.

*See In re Matthews,* 94 N.J. 59, 462 A.2d 165, 176 (1983) (citations omitted). Murder, armed robbery, and conspiracy certainly qualify as "extremely damning past misconduct," thus making Petitioner's burden very heavy.

While agreeing with this Court that there is no litmus test to determine whether an applicant possesses good moral character, the District of Columbia Court of Appeals, in *In re Manville*, 494 A.2d 1289, 1296–97 (D.C.1985) (*Manville I* ), identified a list of factors the court found instructive in assessment of the moral fitness of applicant "whose backgrounds are tainted by criminal convictions." Those factors, intended to be illustrative and not exhaustive, read:

1. The nature and character of the offenses committed.

2. The number and duration of offenses.

3. The age and maturity of the applicant when the offenses were committed.

4. The social and historical context in which the offenses were committed.

5. The sufficiency of the punishment undergone and restitution made in connection with the offenses.

6. The grant or denial of a pardon for offenses committed.

7. The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period.

8. The applicant's current attitude about the prior offenses (*e.g.,* acceptance of responsibility for and renunciation of past wrongdoing, and remorse).

9. The applicant's candor, sincerity and full disclosure in the filings and proceedings on character and fitness.

10. The applicant's constructive activities and accomplishments subsequent to the criminal convictions.

11. The opinions of character witnesses about the applicant's moral fitness.

*Id.* at 1296–97 (footnotes omitted). At best, this applicant satisfies only three of the eleven factors, specifically numbers 9, 10 and 11. He fails to satisfy his heavy burden.

Moreover, the Court's ruling gives insufficient weight to the integrity of the legal system. In the related area of attorney discipline, we have consistently noted that the purpose of disciplining attorneys is to protect the public. *Attorney Griev.*

*Comm. v. Breschi,* 340 Md. 590, 601, 667 A.2d 659, 665 (1995). The public's interest is not served by the admission of a convicted murderer, a person who has demonstrated the most profound disregard for the law and for human life.

Not only must we be concerned with protecting the public, but we must also consider the public's respect for and confidence in the judicial system. I agree with the sentiments of Judge Terry on the District of Columbia Court of Appeals in *In re Manville,* 538 A.2d 1128, 1139 (D.C.1988) (*Manville II* ) (Terry, J., dissenting):

> The bar process is not … akin to the penal system where rehabilitation is one of the primary interests. The admissions process is aimed at selecting not only those persons who will honestly and competently handle their clients' interests, but also those persons who will not diminish respect for the legal profession as an institution.… Certainly the crimes involved here, murder, attempted armed robbery, and drug sales, are precisely the type of crimes which are serious enough to engender such public repugnance that admitting a person convicted of such a crime would seriously damage public confidence in the bar.

A person convicted of the murder of a police officer, attempted armed robbery, and conspiracy will not " 'inspire the public confidence necessary to the proper performance of the duties of an attorney at law.' " *In re Prager,* 422 Mass. 86, 661 N.E.2d 84, 94 (1996) (quoting *In re Keenan,* 314 Mass. 544, 50 N.E.2d 785 (1943)). The murder of a police officer, attempted armed robbery of a bank, and conspiracy rank among the most serious and repugnant crimes. I believe Dortch's admission to the bar would be detrimental to the integrity of the bar and the public interest.

It is ironic to note that if Petitioner were permitted to practice law in this State, and if he were to be called as a witness in any judicial proceeding, his credibility could be impeached with his criminal convictions. *See* Maryland Rule 5–609; *State v. Giddens,* 335 Md. 205, 642 A.2d 870 (1994). In addition, he cannot vote in this State, MD. CONST. art. I, § 4, he

cannot hold office in this State, MD. CONST. art. I, § 12, he cannot serve on a jury, Md.Code (1974, 1995 Repl.Vol., 1996 Cum.Supp.) § 8–207(b)(5) of Courts and Judicial Proceedings Article, and he cannot hold a liquor license, Md.Code (1957, 1996 Repl.Vol.) Art. 2B, § 10–103.

Finally, the past decisions of this Court fully support denying Dortch's application to the bar without encouragement to reapply when and if he is released from parole. We have denied admission to applicants who have committed much less serious crimes. In *In re David H.*, 283 Md. 632, 641, 392 A.2d 83, 88 (1978), we found a lack of good moral character based on five theft offenses over five years, the most serious of which involved breaking into a car and stealing a tape deck. Larceny pales in comparison to the taking of a human life during an armed robbery. *See also In re Application of G.S.*, 291 Md. 182, 433 A.2d 1159 (1981) (denial of admission following conviction for petty thefts).

If the Court's ruling even remotely suggests that Petitioner's application will be granted when his parole ends, then I cannot join the Court's opinion because Petitioner has not met, and indeed probably cannot meet, the heavy burden of proving good moral character after the commission of a crime so heinous as this one.[3] If this Court's ruling means that we shall defer the decision on this petition with no intention of admitting Petitioner, then this ruling is unfair to Dortch as it holds out false hopes. *Cf. Manville I*, 494 A.2d at 1298 (Nebeker, J., dissenting) ("This court does the public, our bar, and our Admissions Committee an injustice when it hedges on these facts and orders further investigation."). This petition for admission to the Bar of Maryland should be denied, without any suggestion that Petitioner reapply when his parole is terminated.

I am authorized to state that Judge Rodowsky joins in the views expressed in this opinion.

---

**3.** It makes no sense to me for the Court to devote sixteen pages merely to state that we will not consider the application until Petitioner is released from parole.