895 A.2d 1050

**In the Matter of the Application of Emsean L. BROWN for Admission to the Bar of Maryland.**

**Misc. Docket No. 10 Sept. Term, 2005.**

Court of Appeals of Maryland.

April 11, 2006.

James Paul Krawczyk, Jr. (Warnken, L.L.C.), Towson, for Applicant.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

BATTAGLIA, Judge.

In this case we are asked to decide whether to grant the petition for admission to the Maryland Bar of Emsean L. Brown, who was convicted of bank fraud in 1991, was incarcerated, and since that time has misrepresented various aspects of his history. We determine that Mr. Brown presently does

not possess the requisite moral character required to be admitted to the Maryland Bar.[1]

## I. Background

In 1989, Emsean L. Brown, then 24, and an employee at the Citizen's Bank of Maryland ("Bank"),[2] with knowledge of how it would be used, began providing customer information—specifically, customers' names, addresses, account numbers, and balances—to Ramona Baldwin, not an employee of the bank, who used the information to obtain Maryland drivers' licenses to gain access to monies from customers' accounts through checks and bank cards provided by Mr. Brown. Mr. Brown and Ms. Baldwin shared the proceeds of the fraud with two additional Bank employees who were also involved in the scheme and an individual employed at the Motor Vehicle Administration who helped obtained the fraudulent drivers' licenses. The Bank suffered a total loss of $94,268.55 as a result of the scheme, $14,250.00 of which Mr. Brown received.

In 1990 the Bank discovered the scheme and terminated Mr. Brown's employment. Mr. Brown subsequently confessed to his involvement and pled guilty to the crime of bank fraud in the United States District Court for the District of Maryland. On February 12, 1991, he was sentenced to ten months imprisonment, three years probation, and the payment of $14,250.00 in restitution. He was released from prison in January of 1992, and, as a condition of probation, was required to pay $100 each month toward his restitution. In January of

---

1. Rule 5(a) of the Maryland Rules Governing Admission to the Bar states in pertinent part:
   (a) **Burden of proof.** The applicant bears the burden of proving . . . the applicant's good moral character and fitness for the practice of law.
   Md. Rule 5 (2004).
   Hereinafter all references to a rule or the rules are to the Rules Governing Admission to the Bar of Maryland in effect in 2004.

2. In 1997, Citizen's Bank was acquired by Crestar Bank, which was later acquired by SunTrust Bank in 1998.

1995 Mr. Brown completed his probation. He also stopped making restitution payments at this time.

In February, 1999 Mr. Brown applied to the University of Baltimore School of Law and marked "No" on his application in response to two pivotal questions:

Have you ever been charged with, arrested for, convicted of, pled guilty or nolo contendere to a violation of any law, including driving under the influence of drugs or alcohol? If so, please provide a complete, factual description of the circumstances surrounding the incident(s) and the court's disposition of the charge(s).

Have you ever been discharged from employment or the armed forces under conditions other than honorable?

Mr. Brown, when applying for admission to the Maryland Bar, represented that he answered "no" to the first question because he thought his conviction had been expunged. He also stated that he had notified the law school when he discovered his conviction had not been expunged. He never explained why he answered "no" to the discharge from employment question.

Additionally, another question on the law school application required Mr. Brown to:

List all full-time employment, including military service, beginning with the most recent. Account for all periods since high school graduation, any intervals between your college years and all positions held since college graduation. If you have spent any significant length of time not in school or working, please explain.

In response, Mr. Brown wrote, "PLEASE SEE RESUME," and attached a resume that listed him as having been employed with the Richard Leahy Corporation from February, 1990 through August, 1992, although, in fact, Mr. Brown actually had been incarcerated from April, 1991 to January, 1992.

On May 16, 2003, Mr. Brown filed an application with the State Board of Law Examiners ("Board") for admission to the

Maryland Bar pursuant to Rule 2.[3] On the application, Mr. Brown disclosed that in 1990 he was convicted of one count of bank fraud and that he failed to affirmatively answer the question on his law school application regarding whether he had ever been convicted of a crime. Mr. Brown did not reveal on his bar application that he also had failed to disclose on his law school application that he had been terminated from employment with the Bank or that he had failed to disclose his lapse in employment history because of his incarceration. Pursuant to Rule 5(b)(1),[4] Mr. Brown's bar application was forwarded to a member of the Character Committee.

During the Committee's investigation, the member assigned the investigation requested that Mr. Brown provide a description of the occurrence that led to the bank fraud conviction and the details surrounding his repayment of the ordered restitution in the form of a sworn affidavit, to which Mr. Brown responded by letter. The Committee member also requested from the law school Mr. Brown's complete law school file, which included correspondence between the Dean, Mr. Brown, and the Public Defender who had represented Mr. Brown when he was convicted. The Committee member subsequently recommended that the Committee conduct a hearing regarding Mr. Brown's application pursuant to Rule 5(b)(2)[5] because there were grounds for denying his applica-

---

3. Rule 2 provides in pertinent part:
   (a) **By Application.** A person who meets the requirements of Rules 3 and 4 may apply for admission to the Bar of this State by filing an application for admission, accompanied by the prescribed fee, with the Board.

4. Rule 5(b) provides in relevant part:
   **Investigation and report of character committee.** (1) On receipt of a character questionnaire forwarded by the Board pursuant to Rule 2(d), the Character Committee shall (a) through one of its members, personally interview the applicant, (b) verify the facts stated in the questionnaire, contact the application's references, and make any further investigation it finds necessary or desirable, (c) evaluate the applicant's character and fitness for the practice of law, and (d) transmit to the Board a report of its investigation and a recommendation as to the approval or denial of the application for admission.

5. Rule 5(b)(2) provides in pertinent part:

tion; a hearing was held on September 26, 2004, at which Mr. Brown was represented by counsel. A Circuit Court Judge, for whom Mr. Brown had clerked, testified on his behalf, and another Circuit Court Judge submitted a letter in support of his admission.

The Committee hearing record revealed that Mr. Brown first notified the law school of his conviction in November, 2000, the first semester of Mr. Brown's second year of law school, when Mr. Brown explained to the Dean, first verbally and then in written form, that he believed he did not have to disclose his conviction because the Public Defender who represented him had assured him that his record would be expunged. Mr. Brown also alleged that at the time of the hearing the University's website contained an application that only required disclosure of convictions that had not been expunged or pardoned, although he was unsure whether the application contained that language at the time that he applied for admission to the law school. With regard to this explanation, the Committee found that, prior to entering law school, Mr. Brown had taken paralegal courses at Montgomery College, which included "Introduction to Legal Systems," "Criminal Law," "Legal Research," and "Business Law," and thus understood the distinction between a conviction and an arrest such that he knew that the law school application was soliciting the disclosure of both. Moreover, the Committee noted that Mr. Brown's Public Defender denied ever advising Mr. Brown that his record would be expunged.

Mr. Brown also asserted that, after being terminated by Citizen's Bank, he gave the head teller of the branch office where he worked a key for a safe-deposit box containing approximately $7,000 to $8,000 in cash, which was then recovered by the Bank to be applied towards restitution. The Committee found, however, that Mr. Brown failed to prove

---

If the Committee concludes that there may be grounds for recommending denial of the application, it shall notify the applicant and schedule a hearing. The hearing shall be conducted on the record and the applicant shall have the right to testify, to present witnesses, and to be represented by counsel.

that he was entitled to credit for the $7,000 to $8,000 because there was no reference to the discovery and seizure of the money in the federal presentence report nor was there any documentation to support his claim. The Committee hearing also revealed that, notwithstanding the $7,000 to $8,000 in cash Mr. Brown claims the Bank recovered, as of the hearing date, Mr. Brown's court-ordered restitution, in fact, had not been satisfied and that Mr. Brown only began to arrange for satisfaction of the restitution through contact with SunTrust Bank when the hearing was scheduled in contemplation of his admission to the Bar. Additionally, the Committee found that the Circuit Court Judge who testified on Mr. Brown's behalf, although informed before employing Mr. Brown of the bank fraud conviction, was not aware of either Mr. Brown's failure to disclose his conviction on his law school application or his failure to complete restitution.[6]

The Committee determined that:

A. That the bank fraud conviction in 1990 coupled with the facts and circumstances surrounding the scheme to defraud bank customers is a course of conduct which involved serious moral turpitude.

B. That the Applicant's failure to address, acknowledge and satisfy the restitution requirement of the Judgment in a Criminal Case (Case No. JH–90–0376) is not consistent with the fitness required to practice law in Maryland.

C. That the Applicant's failure to make a full and complete disclosure of the criminal incident on his Law School application, whether in response to the question regarding criminal arrest/conviction or the question regarding discharge from employment, is not justified by the belief, past or present, or the assertion, that the criminal record is expunged.

---

6. The record before the Committee does not address whether the Circuit Court Judge who submitted a letter in support of Mr. Brown's admission was aware at the time of the hearing of Mr. Brown's failure to complete restitution and lack of disclosure on his law school application.

D. The accomplishments and development of the Applicant are not without merit and recognition. However, he has not yet met the burden of proving, by clear and convincing evidence, good moral character and present fitness to practice law in the State of Maryland.

and recommended that Mr. Brown's application to the Bar be denied.

Pursuant to Rule 5(c),[7] the State Board of Law Examiners then gave Mr. Brown an opportunity to be heard on April 15, 2005. Mr. Brown appeared with counsel and presented five witnesses, all of whom had worked with Mr. Brown, including: three Circuit Court Judges, all of whom testified telephonically, a former Assistant Public Defender, and the General Counsel for Morgan State University. Mr. Brown also supplied the Board with numerous documents, including affidavits attesting to his character from: the mother of his child, stating that, after Mr. Brown's paternity was established, Mr. Brown had become an active part of his daughter's life and initiated child support payments on his own accord; former managers from previous jobs; a classmate from law school; a classmate from college and a classmate from high school, in addition to an affidavit from Emmanuel Bailey, former Manager of the branch office of the Bank where Mr. Brown was employed, stating that he and Jerilynn Taylor, former Assistant Vice President of the Bank, opened up the safe deposit box and recovered thousands of dollars. He also supplied copies of letters that he had penned to Dana Bruce, paralegal with SunTrust Bank, affirming that Mr. Brown had completed payment of restitution to the Bank as of October 2004 and another to Ms. Taylor requesting that she provide any information she may have regarding the recovered cash. In response, a letter was submitted to the Board by Ms. Taylor

---

**7.** Rule 5(c) provides in relevant part:

**Hearing by board.** If the Board concludes after review of the Committee's report and the transcript that there may be grounds for recommending denial of the application, it shall promptly afford the applicant the opportunity for a hearing on the record made before the Committee.

disclaiming Mr. Brown's contention that she had recovered cash from a safe deposit box.

The record developed before the Board also reflected that in October of 2004, Mr. Brown telephoned Ms. Dana Bruce, a paralegal with SunTrust Bank, to discuss completion of his restitution, and that he initially identified himself to her as an attorney. The Board was unable to ascertain whether Mr. Brown had satisfied his obligation to make restitution, which Mr. Brown had calculated to be $3,650 in September, 2004, and which he paid in October, 2004, or whether a safe deposit box had been found.

In addition to the Committee's finding that Mr. Brown denied both his bank fraud conviction and termination from Citizen's Bank on his law school application, the Board record further revealed that at the time Mr. Brown was applying to law school he understood what it meant to be charged with a crime as opposed to being convicted of a crime, but was not aware of the procedural nuances for expungement of a federal conviction as distinguished from a state conviction. Upon attending his first year of law school, however, Mr. Brown asserted that he had learned that, unlike a conviction of a state crime, a federal conviction requires a presidential pardon for expungement, which he had not received, thereby requiring disclosure of the conviction to the law school. Additionally, although within the record of the Committee, the Board addressed, for the first time, the fact that Mr. Brown had not revealed his incarceration on the resume that he attached to his law school application by indicating that he was employed during that time. The Board report included Mr. Brown's statement that it was not his intention in attaching the inaccurate resume to make the law school believe that he never was incarcerated.

Testimony before the Board also revealed that none of the five witnesses presented by Mr. Brown at the hearing was aware of his failure to disclose his termination from employment and conviction of bank fraud on his law school application, the falsification of employment dates on the resume

attached to the application, and his neglect in completing the court-ordered restitution. Moreover, none of Mr. Brown's employers prior to or during law school was aware of his conviction. To this end, Mr. Brown testified before the Board that none of these employers had required him to fill out an application or disclose whether he had any prior convictions during the application process. He further testified that he was placed at Howrey & Simon, a law firm at which he worked before law school, through a temporary agency, and that he had disclosed his conviction to the temporary agency, when required to do so.

The Board decided by a majority of four to three that,

[w]hile the Board believes he was opportunistic with regard to his law school application, restitution and his dealings with Ms. Bruce at SunTrust Bank, the majority does not believe these incidents to be determinative with regard to the applicant's rehabilitation.

The crime for which the applicant was convicted occurred fifteen years ago. The applicant was twenty-four years old at the time. In spite of the conviction, he continued working and completed his education. He is now married with two children. He has no record of committing further crimes. The record reflects the applicant's remorse for his actions of fifteen years ago. The applicant has presented positive testimony regarding his work and integrity, including two Judges from Circuit Court in Montgomery County, one from the Circuit Court for Baltimore City and two members of the Maryland Bar. His employment references indicate a conscientious work record and did not indicate criminal activity.

Pursuant to Rules 5(c) and (d),[8] a show cause hearing was held before this Court to determine whether it should accept the Board's recommendation.

---

8. Rule 5(c) and (d) provide in relevant part:

(c) **Hearing by board.** . . . If the Board decides to recommend denial of the application in its report to the Court, the Board shall first give the applicant an opportunity to withdraw the application. If the

## II.  Standard of Review

█  The issue before us is whether Mr. Brown possesses the *present* good moral character to practice law.  *In re Application of Hyland*, 339 Md. 521, 535, 663 A.2d 1309, 1316 (1995).  Good moral character is required for admission to any Bar and is denoted by "those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility."  *Id.* at 534, 663 A.2d at 1315 (quoting *Schware v. Board of Bar Examiners*, 353 U.S. 232, 247, 77 S.Ct. 752, 760, 1 L.Ed.2d 796, 806 (1957) (Frank-furter, J., concurring)).

█  When an applicant has engaged in criminal activity, to meet his or her burden of proving good moral character and fitness for the practice of law pursuant to Rule 5(a), the applicant must show that "he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion."  *In re Application of A.T.*, 286 Md. 507, 514, 408 A.2d 1023, 1027 (1979); *In re Application of Allan S.*, 282 Md. 683, 690, 387 A.2d 271, 275 (1978).  Thus, "the absence of good moral character in the past is secondary to the existence of good moral character in the present," *Application of Allan S.*, 282 Md. at 691, 387 A.2d at 275, and the past conviction merely "adds to his burden of establishing present good character by

---

applicant withdraws the application, the Board shall retain the records.  Otherwise, it shall transmit to the Court a report of its proceedings and a recommendation as to the approval or denial of the application together with all papers relating to the matter.

(d) **Review by Court.**  (1) If the applicant elects not to withdraw the application, after the Board submits its report and adverse recommendation the Court shall require the applicant to show cause why the application should not be denied.

(2) If the Board recommends approval of the application contrary to an adverse recommendation by the Committee, within 30 days after the filing of the Board's report the Committee may file with the Court exceptions to the Board's recommendation.  The Committee shall mail copies of its exceptions to the applicant and the Board.

(3) Proceedings in the Court under this section shall be on the records made before the Character Committee and the Board.  If the Court denies the application, the Board shall retain the records.

requiring convincing proof of his full and complete rehabilitation." *In re Application of Dortch,* 344 Md. 376, 387, 687 A.2d 245, 250 (1997) (quoting *Application of Allan S.,* 282 Md. at 690, 387 A.2d at 275). Factors considered when an applicant presents a prior conviction are: whether the conviction was of a crime of moral turpitude; the time of its commission; other relevant circumstances involved; the fact that the burden rests upon the applicant to prove his good moral character; and then, most importantly, whether the applicant has been rehabilitated. *In re Application of James G.,* 296 Md. 310, 316–17, 462 A.2d 1198, 1202 (1983); *Application of Allan S.,* 282 Md. at 692, 387 A.2d at 277.

Although the Board's recommendation to admit Mr. Brown is entitled to great weight, because this Court is charged with "the primary and ultimate responsibility for regulating the practice of law and the conduct and admission of attorneys in this State," we make our own independent assessment of the applicant's present moral character based upon the records assembled before the Committee and the Board. Rule 5(d)(3); *Application of Hyland,* 339 Md. at 536, 663 A.2d at 1316; *In re Application of Charles M.,* 313 Md. 168, 178–80, 545 A.2d 7, 12 (1988); *In re Application of K.B.,* 291 Md. 170, 177, 434 A.2d 541, 544 (1981); *Application of Allan S.,* 282 Md. at 690–91, 387 A.2d at 276.

## III. Discussion

Mr. Brown argues that he has rehabilitated himself since being convicted of bank fraud in 1990. He contends that his rehabilitation is demonstrated by the fact that, since his conviction, he has held two positions of trust involving the accounting for monies without incident, as well as completed his college education and put himself through law school. He also contends that three judges testified that he possesses the requisite moral character before the Board, two of whom supervised him, in addition to two members of the Maryland Bar, all of whom were aware of Mr. Brown's federal conviction. Mr. Brown also points out that when the Bank approached him regarding the crime, he readily confessed and

fully cooperated with the FBI's investigation, and he did not contest his guilt, but rather pled guilty to the crime. Additionally, Mr. Brown asserts that he made restitution of $7,000.00 to $8,000.00 of the stolen monies to the Bank at the time of his conviction by turning over a key to a safe deposit box where he had placed some of the funds. Mr. Brown also contends that he has since made full restitution to the Bank. Mr. Brown argues that he has met his burden of proof and his admission should be granted. We disagree.

In the case *sub judice*, Mr. Brown was convicted of bank fraud, a crime of moral turpitude. *See Attorney Grievance Commission v. Shaffer*, 305 Md. 190, 196, 502 A.2d 502, 505 (1986). The conviction occurred over thirteen years ago, which, although is a "significant and substantial" passage of time, *Application of A.T.*, 286 Md. at 515, 408 A.2d at 1028, it is also a significant period of time for Mr. Brown to have rehabilitated himself and established that he presently possesses good moral character. Mr. Brown has not, however, exploited that opportunity, as is evidenced by his dereliction in completing his court-ordered restitution, failure to disclose both his conviction and his termination from employment at Citizen's Bank on his law school application, concealment of his term of incarceration on the resume that he attached to that application, and recent misrepresentation of himself as a lawyer.

Mr. Brown presents a complex labyrinth regarding whether he has completed the restitution ordered by a federal court over fifteen years ago. Although Mr. Brown claims to have completed restitution, there is no record of the $7,000 to $8,000 allegedly recovered from a safe deposit box in the federal presentence report or any federal probationary document, or with the Bank. Although Emmanuel Bailey, Mr. Brown's manager at the Bank, swore in an affidavit that he and Jerrilyn Taylor together recovered thousands of dollars, Ms. Taylor has disavowed those assertions. Whether Mr. Brown actually paid the $7,000 to $8,000 remains in issue; he has failed to carry his burden of proof with respect to this aspect of his rehabilitation.

In *In re Application of Hyland,* 339 Md. 521, 663 A.2d 1309 (1995), the applicant also failed to meet his burden of proof as to whether he had completed payment of court-ordered restitution and debts owed to the Internal Revenue Service. Prior to law school, the applicant pled guilty to fifteen counts of failure to remit sales taxes in violation of Pennsylvania state law and, in addition to a forty-five day prison term, was sentenced to pay restitution. He also failed to remit federal government employee income tax withholdings, thereby owing the Internal Revenue Service approximately $125,000 and significant penalties. We noted that failure to make restitution "is an important factor in assessing good moral character," 339 Md. at 535, 663 A.2d at 1316, and that,

> [g]iven the duties that attorneys are ordinarily required to perform, we think that the applicant's failure to carry out his significant legal obligation to satisfy his tax debt to the federal government and the Commonwealth of Pennsylvania is connected to his fitness to practice law. This conduct reflects adversely on the applicant's personal commitment to the proper administration of justice, as well as his honesty and truthfulness.

*Id.* at 538, 663 A.2d at 1317. In conclusion, we found that:

> [T]he applicant has failed to satisfy his burden that he presently possesses those qualities that comprise good moral character necessary for the practice of law. . . . We believe the record shows that the applicant does not appreciate the fiduciary responsibility incumbent upon an attorney when entrusted with the monies of another person. He does not appreciate the analogy between the tax obligations and the client trust account responsibilities. . . .
>
> We believe that the applicant's failure to honor his financial obligations evidences a disregard of a legal obligation and reflects adversely on his fitness to practice law.

*Id.* at 536, 663 A.2d at 1316. Accordingly, we denied the application.

With respect to the many significant lapses of truthfulness related to Mr. Brown's law school application, it is a given that

good moral character includes truthfulness and candor, and absolute candor is a requisite of admission to the Maryland Bar. *See Application of Hyland,* 339 Md. at 535–36, 663 A.2d at 1315–16; *Application of K.B.,* 291 Md. at 181, 434 A.2d at 546; *Application of Allan S.,* 282 Md. at 689, 387 A.2d at 275. In 1999, Mr. Brown responded in the negative to the questions on his law school application asking whether he had ever been charged with, arrested for, or convicted of a violation of law, and whether he had ever been terminated from employment. Although Mr. Brown has alleged that he was advised by his Public Defender that his conviction was expunged, the same Public Defender has disavowed this allegation. Also, the alleged expungement does not explain Mr. Brown's lack of candor regarding his termination from employment with Citizen's Bank, for which he has offered no explanation.

Mr. Brown's integrity is further impugned by the fact that he also concealed his incarceration on the resume that he attached to his law school application by affirmatively stating that he was employed during the same period. Although during oral argument before this Court, Mr. Brown's attorney represented that Mr. Brown did not intentionally misrepresent his dates of employment to conceal his incarceration because "in updating the resumes, the dates got confused" and a "clerical error" occurred, it is difficult, if not impossible, to believe that anyone could forget that he spent ten months in jail.

This Court has denied admission of applicants who, like Mr. Brown, through their actions, have failed to demonstrate post-conviction rehabilitation. In *In re Application of K.B.,* 291 Md. 170, 434 A.2d 541 (1981), this Court denied the application of a candidate who disclosed on his Bar application that he had committed bigamy but never faced criminal charges for the offense, who, two weeks after filing that application, became involved in a mail fraud scheme, and who, the day after he took his first bar examination, opened a department store credit card under a fictitious name. In denying the application, the Court opined:

In weighing the evidence of rehabilitation ... it must be recognized that we deal here with a continuous course of criminal activity which was perpetrated by a mature adult. K.B. was 28 and 29 years of age when the fraud scheme was in effect. At age 21 he had become embroiled in the bigamous marriage, but he told the Character Committee in his application filed when he was 28 years old, that he had learned his lesson as a result of that earlier experience. Obviously he did not. We must further recognize that the continuous course of criminal activity occurred while K. B was in his senior year of law school and after his completion of law school studies. He had the benefit of four years of exposure to the ethics and traditions of the profession.

*Id.* at 180, 434 A.2d at 546. Likewise, in the case *sub judice,* Mr. Brown's actions demonstrate a continuous course of dishonesty which negates his claim of rehabilitation.

In fact, as recently as 2004, Mr. Brown continued to be disingenuous when he chose to identify himself as a lawyer to Ms. Bruce at SunTrust Bank when attempting to get information relevant to completion of his restitution. While admitting that this action displayed a complete lack of candor, Mr. Brown claims that he made the misrepresentation out of sheer frustration in trying to get Ms. Bruce to return his phone calls. Mr. Brown's actions not only implicate those concerns reflected in Section 10–601 of the Business Occupations and Professions Article, which prohibits the unauthorized practice of law,[9] but his decision to hold himself out as a lawyer in order to gain an advantage in obtaining information conflicts with his claim of being rehabilitated. It is understandable that Mr. Brown wishes to put his conviction behind him and move on to become a Maryland lawyer; however, misrepre-

---

**9.** Section 10–601(a) provides in pertinent part:

**Unauthorized practice of law**

(a) *In general.*—Except as otherwise provided by law, a person may not practice, attempt to practice, or offer to practice law in the State unless admitted to the Bar.

Md.Code (2000, 2004 Repl.Vol.), § 10–601(a) of the Business Occupations and Professions Article.

senting his status only reflects poorly upon his present moral character.

## Conclusion

Therefore, although we give great weight to the Board's determination, albeit in a four-to-three decision, our independent review of the record leads us to conclude that Mr. Brown has failed to meet his burden of proving that he is fully and completely rehabilitated, such that he presently possesses the good moral character and fitness required for admission to the Bar of Maryland. Accordingly, Mr. Brown's application is denied.

**IT IS SO ORDERED.**

BELL, C.J. Dissents.

Dissenting Opinion by BELL, Chief Judge.

To qualify to take the Maryland Bar Examination, and thus, for admission to the Bar of Maryland, an applicant "must have completed the pre-legal education necessary to meet the minimum requirements for admission to an American Bar Association approved law school," Rule 3 of the Maryland Rules Governing Admission to the Bar, and have graduated, or be unqualifiedly eligible for graduation, from an ABA approved law school. Rule 4(a).[1] In addition, he or she must apply to take the examination, Rule 2(a), (c)[2] and Rule 6(a), and be of "good moral character" and "fit[ ] for the practice of law."

---

1. Rule 4(a) of the Rules Governing Admission to the Bar of Maryland provides:

   "(1) In order to take the bar examination of this State a person either shall have graduated or shall be unqualifiedly eligible for graduation from a law school.

   "(2) The law school shall be located in a state and shall be approved by the American Bar Association."

2. Rule 2, as pertinent, provides:

   "(a) *By Application.* A person who meets the requirements of Rules 3 and 4 may apply for admission to the Bar of this State by filing an application for admission, accompanied by the prescribed fee, with the Board.

   \* \* \* \*

Rule 5(a).[3]  As to the proof of the latter, the burden is on the applicant.  Rule 5(a).

Rule 5 prescribes the procedure by which the moral character and fitness of an applicant for admission to the Bar of Maryland is assessed and whether he or she will be admitted is determined.  It is a three step process:  the Character Committee conducts an investigation, consisting of, inter alia, interviewing the applicant, verifying the accuracy of representations in the questionnaire, contacting references, evaluates the applicants character and fitness for the practice of law, and reports the results, with its recommendation, to the Board of Law Examiners.  Rule 5(b)(1).[4]  If its investigation or

---

"(c) *Time for Filing.*

"(1) *Without Intent to Take Particular Examination.*  At any time after the completion of pre-legal studies, a person may file an application for the purpose of determining whether there are any existing impediments to the applicant's qualifications for admission.

\* \* \* \*

"(2) *With Intent to Take Particular Examination.*  An applicant who intends to take the examination in July shall file the application no later than the preceding January 16 or, upon payment of the required late fee, no later than the preceding May 20.  An applicant who intends to take the examination in February shall file the application no later than the preceding September 15 or, upon payment of the required late fee, no later than the preceding December 20...."
Rule 6(a) provides:

"(a) *Filing.* An applicant may file a petition to take a scheduled bar examination if the applicant (1) is eligible under Rule 4 to take the bar examination and (2) has applied for admission pursuant to Rule 2 and the application has not been withdrawn or rejected pursuant to Rule 5. The petition shall be under oath and shall be filed on the form prescribed by the Board."

3.  Rule 5 governs *"Character review."*  Section (a) provides:
"(a) *Burden of Proof.*  The applicant bears the burden of proving to the Character Committee, the Board, and the Court the applicant's good moral character and fitness for the practice of law. Failure or refusal to answer fully and candidly any question set forth in the application or any relevant question asked by a member of the Character Committee, the Board, or the Court is sufficient cause for a finding that the applicant has not met this burden.
"(c) *Continuing review.*  All applicants remain subject to further Committee review and report until admitted to the Bar."

4.  "(b) *Investigation and report of character committee.*  (1) On receipt of a character questionnaire forwarded by the Board pursuant to Rule

review reveals grounds for recommending denial of the applicant's application, the Committee must conduct a hearing, at which the applicant may be represented by counsel, offer evidence and testify, and a transcript of which will accompany its report and recommendation to the Board. Rule 5(b)(2).[5] The Board reviews the Committee's report and recommendation and, if the Committee conducted a hearing, the transcript of the hearing. It will conduct a hearing if it concludes that there are grounds for recommending denial of the application. The Board submits its report and recommendation to this Court. Rule 5(c).[6] Unless the applicant withdraws his or her application, this Court will hold a hearing on "the records made before the Character Committee and the Board." Rule

---

2(d), the Character Committee shall (A) through one of its members, personally interview the applicant, (B) verify the facts stated in the questionnaire, contact the applicant's references, and make any further investigation it finds necessary or desirable, (C) evaluate the applicants character and fitness for the practice of law, and (D) transmit to the Board a report of its investigation and a recommendation as to the approval or denial of the application for admission."

5. "(b)(2) If the Committee concludes that there may be grounds for recommending denial of the application, it shall notify the applicant and schedule a hearing. The hearing shall be conducted on the record and the applicant shall have the right to testify, to present witnesses, and to be represented by counsel. A transcript of the hearing shall be transmitted by the Committee to the Board along with the Committee's report. The Committee's report shall set forth findings of fact on which the recommendation is based and a statement supporting the conclusion. The Committee shall mail a copy of its report to the applicant, and a copy of the hearing transcript shall be furnished to the applicant upon payment of reasonable charges."

6. "(c) *Hearing by board.* If the Board concludes after review of the Committee's report and the transcript that there may be grounds for recommending denial of the application, it shall promptly afford the applicant the opportunity for a hearing on the record made before the Committee. The Board shall mail a copy of its report and recommendation to the applicant and the Committee. If the Board decides to recommend denial of the application in its report to the Court, the Board shall first give the applicant an opportunity to withdraw the application. If the applicant withdraws the application, the Board shall retain the records. Otherwise, it shall transmit to the Court a report of its proceedings and a recommendation as to the approval or denial of the application together with all papers relating to the matter."

5(d)(3).[7] That hearing will either be on a show cause order requiring the applicant to show cause why the Board adverse recommendation should not be accepted, Rule 5(d)(1);[8] *see Application of Hyland,* 339 Md. 521, 526, 663 A.2d 1309, 1311 (1995), or, when the Board recommends admission, contrary to the Committee's recommendation that the application be denied, on exceptions filed by the Committee. Rule 5(d)(2).[9]

As required by Rule 5(b), the Character Committee interviewed the applicant, investigated his character, including his criminal record, and held a hearing at which it took testimony and evidence relating to his character and his post-conviction rehabilitation. It found that the applicant did not possess the quality of character necessary for admission to the Bar. Therefore, the Committee reported to the Board, that the applicant had not proven by clear and convincing evidence that he had been sufficiently rehabilitated. Accordingly, it recommended to the Board that the applicant's application for admission be denied.

Subsequently the Board of Law Examiners, under Rule 5(c), has the responsibility to review the Character Committee's findings, make an independent determination as to the applicant's character and rehabilitation, and report, with recommendation to the Court of Appeals. Not only does the Board review the Committee's report and recommendation, but it is also a first-level fact-finder. This is so because, pursuant to Rule 5(c), the Board, under some circumstances, is required to

---

7. "(3) Proceedings in the Court under this section shall be on the records made before the Character Committee and the Board. If the Court denies the application, the Board shall retain the records."

8. "(d) *Review by court.* (1) If the applicant elects not to withdraw the application, after the Board submits its report and adverse recommendation the Court shall require the applicant to show cause why the application should not be denied."

9. "(2) If the Board recommends approval of the application contrary to an adverse recommendation by the Committee, within 30 days after the filing of the Board's report the Committee may file with the Court exceptions to the Board's recommendation. The Committee shall mail copies of its exceptions to the applicant and the Board."

hold an evidentiary hearing, at which evidence is accepted and testimony is taken, which entails observing witness demeanor and making credibility determinations, just like a trial court.[10] The Board, therefore, often makes, and, in fact, is required to make, factual findings, whether they are contradictory to those of the Character Committee, or not.

The Board held a hearing in this case, at which the applicant, and others, testified. After this hearing, the Board made its own factual findings and recommendations. The Board, unlike the Character Committee, determined that Brown had been rehabilitated and presently possessed good moral character and fitness to practice law in this state. Thus, it recommended to the Court of Appeals that the applicant be admitted to the Bar. In so recommending, the Board must have found the applicant's explanations regarding his original crime, his court-ordered restitution, his failure to note his conviction on his law school application, his flawed resume, and his misrepresentation of himself as an attorney credible, and must have believed him to be a candid witness. Otherwise, it would not have recommended his admission.

The applicant seeks admission to the bar after conviction of bank fraud, a crime implicating the applicant's honesty, an attribute particularly important in a lawyer. *Fellner v. Bar Ass'n*, 213 Md. 243, 131 A.2d 729 (1957); *In re Meyerson*, 190 Md. 671, 59 A.2d 489 (1948). *Such a conviction is not absolutely disqualifying, however.* There is no litmus test for moral character or fitness for the practice of law. *Allan S.*, 282 Md. at 690, 387 A.2d at 275. This Court has, however, enunciated factors and considerations to be considered:

"Where, as here, an applicant for admission to the Bar is shown to have committed a crime, the nature of the offense must be taken into consideration in determining whether his present moral character is good. Although a prior convic-

10. The determination of the facts is based in part upon the credibility of the witness. In this way, when his or her motive or intention is at issue, an applicant's credibility is indelibly bound with the facts, and must be reviewed accordingly.

tion is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation. Thus, a prior conviction must be taken into account in the overall measurement of character and considered in connection with other evidence of subsequent rehabilitation and present moral character. It is not without significance in this regard, as bearing upon moral fitness, that an applicant for admission to the bar refuses to admit his criminal conduct.

"The ultimate test of present moral character, applicable to original admissions to the Bar, is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion. That the absence of good moral character in the past is secondary to the existence of good moral character in the present is a cardinal principle in considering applications for original admission to the Bar."

*Allan S.,* 282 Md. at 690, 387 A.2d at 275.

Although "we do not apply the 'substantial evidence' test applicable to court review of decisions of administrative agencies" and we are required to "make our own independent evaluation of the applicant's present moral character based 'upon the records made by the Character Committee and the Board,'" *Application of Allan S.,* 282 Md. 683, 691, 387 A.2d 271, 276 (1978), quoting Rule 4 c, now Rule 5(d)(3), the Board's recommendation, whether it is that an applicant does not possess the requisite moral character fitness, *id.* at 690–91, 387 A.2d at 276; *Application of Hyland,* 339 Md. at 536, 663 A.2d at 1316, or that the applicant has the requisite moral fitness, *Application of A. T.,* 286 Md. 507, 515, 408 A.2d 1023, 1028 (1979), is, nevertheless, entitled to great weight. Indeed, that this Court accepts the recommendation of the Board is the rule and the failure to do so, the exception. *See In the Matter of the Application of William H. Hyland,* 339 Md. 521,

536, 663 A.2d 1309, 1316 (1995); *In the Matter of the Application of Charles M.*, 313 Md. 168, 178, 545 A.2d 7, 12 (1988); *In re Application of Maria C.*, 294 Md. 538, 451 A.2d 655 (1982); *In re Application of G.L.S.*, 292 Md. 378, 439 A.2d 1107 (1982); *In the Matter of the Application of A.T.*, 286 Md. 507, 515, 408 A.2d 1023, 1028 (1979). *See also In re Sanderson*, 387 Md. 352, 875 A.2d 702 (2005); *In re Costanzo*, 385 Md. 122, 867 A.2d 1039 (2005); *In re Lawson*, 380 Md. 194, 844 A.2d 405 (2004); *In re Application of Rosendale*, 372 Md. 691, 816 A.2d 68 (2003); *In re Application of Alonso*, 372 Md. 136, 812 A.2d 291 (2002); *In re Gardner*, 368 Md. 505, 796 A.2d 90 (2002); *In re Levenson*, 356 Md. 1, 736 A.2d 1056 (1999); *In re Alexander*, 355 Md. 284, 734 A.2d 241 (1999). In fact, in the previous thirty years, we have refused to accept the Board's recommendation only nine times out of an approximate sixty-five cases. *See In re Application of Boccone*, 373 Md. 358, 818 A.2d 1077 (2003) (order only); *In re Hersh*, 354 Md. 329, 731 A.2d 438 (1999) (order only); *Application of Vann*, 349 Md. 101, 707 A.2d 87 (1998) (order only); *Application of Dortch*, 344 Md. 376, 687 A.2d 245 (1997) (order only); *Application of J.L.L.*, 304 Md. 394, 499 A.2d 935 (1985) (order only); *Application of George B.*, 297 Md. 421, 466 A.2d 1286 (1983); *Application of K.B.*, 291 Md. 170, 434 A.2d 541 (1981); *Application of David H.*, 283 Md. 632, 392 A.2d 83 (1978); *Application of Allan S.*, 282 Md. 683, 387 A.2d 271 (1978). Only in four of these cases did we issue an opinion rather than an order. *See Application of George B.*, 297 Md. 421, 466 A.2d 1286 (1983); *Application of K.B.*, 291 Md. 170, 434 A.2d 541 (1981); *Application of David H.*, 283 Md. 632, 392 A.2d 83 (1978); *Application of Allan S.*, 282 Md. 683, 387 A.2d 271 (1978).

In those instances in which we declined to follow the Board's recommendation with respect to the grant or denial of an applicant's application for admission, factual determinations were not dispositive or even in conflict. In fact, the facts in those cases were clear and undisputed and there were no credibility issues to be resolved. In *Allan S*, for example, the parting of the ways between the Court and the Board had to do with the weighing process. The fact of his criminal behav-

ior having been established, what it predicted with respect to his future actions and what to make of the subsequently established facts pertaining to the applicant's rehabilitation were the matters to be considered and weighed. The Board's recommendation focused backward on the criminal action and on its disbelief of the motive for it offered by the applicant. Rejecting that approach, this Court pointed out:

"We think the Board has afforded controlling weight to that part of the applicant's testimony that involves the 1971 theft and has given insufficient consideration to his present moral character and the evidence of his rehabilitation since the commission of that offense. It must be remembered that applicant's first offense occurred in 1966, eleven years prior to the hearing before the Board; the 1971 offense occurred almost seven years prior to that hearing. While there can be no doubt that each of these offenses, though petty in nature, involved moral turpitude, the applicant readily admitted that he committed the crimes even though he was never tried or convicted of either of them. In this respect, he was most candid with the Board and we cannot agree, in view of the record in this case, that the applicant did not admit that his acts were morally wrong and indefensible. On the contrary, he did so repeatedly, both before the Character Committee and the Board, and we are satisfied that he is deeply distressed that he participated in such conduct."

282 Md. at 691, 387 A.2d at 276.

In *David H.*, the Court again weighed the facts and circumstances differently than did the Board. 283 Md. at 640, 392 A.2d at 87. Again, the facts of the criminal conduct were not at issue, nor were there any factual determinations to be made that depended on the applicant's credibility. Whereas the Board, on this occasion, focused on the applicant's future, as it projected it from the applicant's behavior subsequent to the criminal activity that was the subject of the proceedings, concluding "that his actions since 1972 speak as elegantly, or more so, than his oral testimony, and that the risk [of recurrence] is slight. In short, we are satisfied that (the applicant)

has been rehabilitated," *id.* at 638, 392 A.2d at 86, the Court focused on the past and, distinguishing *Allan S.,* noted:

> "Unlike the circumstances in Allan S., the present applicant's criminal conduct, by his own admission, persisted over an extended period of time. The thefts committed by the applicant were not, as in Allan S. isolated criminal transgressions; rather, they constituted a continuous course of criminal activity which the applicant did not see fit to terminate until after his graduation from college."

*Id.* at 640, 392 A.2d at 87. That and the fact that

> "the applicant's determination to conclude his criminal activity apparently did not flow from an 'inborn' resolve to change his moral character; rather, the change was wrought as a result of the consequences to the applicant which emanated from his prosecution for those theft offenses for which he was apprehended by the police. Had he not been caught, the applicant, according to his own account, may well have continued to steal,"

*id.* at 640, 392 A.2d at 87–88, and that "the rehabilitative period" was only approximately five years and the applicant was rather young, only 28, and could reapply, the Court concluded:

> "at this time the applicant has not 'so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion.' "

*Id.* at 641, 392 A.2d at 88, quoting *Allan S.,* 282 Md. at 690, 387 A.2d at 275.

The nature of the criminal activity engaged in by the applicant in *K.B.* was also not in dispute; as characterized by the Court, "[i]n the present matter, we do not deal with a single transgression. Four separate fraudulent applications for credit accounts are involved." 291 Md. at 177, 434 A.2d at 545. And those multiple transgressions involved some 100 transactions and extended over a period of about fifteen months. *Id.* at 177–78, 434 A.2d at 545. The Board's recommendation was based on its conclusion that the applicant had a "sole slip from grace" and that he had made restitution for the

fraudulent transactions. The Court rejected this charitable characterization of the applicant's criminal actions and determined that the Board's conclusion with respect to restitution did not follow from the record evidence:

"After K.B.'s arrest in November of 1975 he continued to work for the title company until his sentencing in July of 1976. There is no indication that the applicant undertook to make any restitution during that period. The applicant testified he made a payment of several hundred dollars to Amoco prior to leaving for prison. Following his confinement, the applicant had been employed continuously since February of 1977, but he did not resume making any restitution until November 1977. The plan of partial restitution, which was acceptable to Amoco, was arranged by K.B.'s attorney in obvious preparation for the November 1977 hearing before the Board. We are far from convinced that the plan of partial restitution was prompted by a full and complete rehabilitation which occurred two years earlier at the time of arrest."

*Id.* at 179, 434 A.2d at 545. Further weighing the evidence as to rehabilitation, the Court expressed concern with regard to what it discerned to be a "continuous course of criminal activity . . . perpetrated by a mature adult. K.B. was 28 and 29 years of age when the fraud scheme was in effect." *Id.* at 180, 434 A.2d at 546. We concluded that we had:

"the very distinct impression that this applicant's past criminal problem resulted from the perceived necessity to maintain a desired level of social prestige which, in this case, involved operating a car, and from a willingness to risk violating serious criminal laws in order to do so. Every experienced practitioner knows of cases where an attorney has yielded to the temptation to 'borrow' clients' funds entrusted to him because of the pressure to maintain a certain social status while waiting for some fees to come in. It is because of the great risk to the public in admitting to the Bar one who has exhibited this serious character flaw that we require the evidence of present moral fitness to

'unequivocally demonstrate ... full and complete rehabilitation.' "

*Id.* at 181, 434 A.2d at 546, quoting *David H.*, 283 Md. at 641, 392 A.2d at 88.

*George B.*, 297 Md. 421, 466 A.2d 1286, is reflective of what was essentially a policy decision by the Court. There, the applicant was denied admission, although both the Board and the Character Committee recommended to the contrary, because only six years had elapsed since his release from prison for the felony offense of attempted armed bank robbery, which, we noted, involved an exchange of gunfire between the applicant and a bank guard and, therefore, was "a criminal transgression of a most serious nature, exceeding that involved in *In re Application of G.L.S.*, 292 Md. 378, 439 A.2d 1107 (1982)," 297 Md. at 421, 466 A.2d at 1286, and "th[at] rehabilitative period ... [was] of insufficient duration, considering the gravity of the offense committed, to permit establishment of the requisite moral character fitness prerequisite to admission to the Bar of Maryland." *Id.* at 422, 466 A.2d at 1286.

Those cases are not this one. While in those cases, there were no critical credibility issues that had to be resolved contrary to their resolution by the Board, only questions concerning the appropriate balance to be struck in the interest of the integrity of the profession, here, the applicant's credibility and the issue of proper balancing are inextricably bound up with factual issues viewed and resolved one way by the Committee and the majority, as per the majority opinion, and the opposite way by the Board. For example, central to the question of the applicant's rehabilitation was the question of whether he had made restitution and whether it was complete restitution. In turn, a related question involved money allegedly in a safe deposit box, and, in particular, its existence, its disposition, and whether, as contended by the applicant, it was used for the payment of restitution.

Where the facts are not in dispute, how one evaluates them does not implicate fact-finding and credibility determinations.

Where, however, the facts are disputed so that credibility determinations are implicated, as for example, relating to motive, the factual findings by the trier of fact, in this instance the Board, may be critical. In order to evaluate the facts, it must be clear what the facts are and what the facts are will, in many instances, turn on whether the trier of fact credits or discredits a particular witness.

There are factual disputes in this case, largely those relating to motive and intent, but factual determinations, nevertheless. And those determinations depend on assessment of the witness's, in this case, the applicant's, credibility. With respect to the money in the safe deposit box, the Board found that "many credible explanations were given as to the existence of the money in the safe deposit box. The money was never properly accounted for." Although it did not expressly state that it accepted, and believed, the applicant with respect to the issue, the opposite conclusion would be illogical and inconsistent, given the Board's recommendation that the applicant be admitted to the Maryland Bar. Similarly with regard to the whether the applicant completed restitution, i.e. paid it in full, rather than stating an unequivocal finding that the applicant had made full restitution, the Board commented, "there is conflicting evidence" on the issue. Its recommendation that the applicant be admitted speaks volumes, however, and suffices to make clear that it resolved the conflict in the applicant's favor.

A question was raised as to whether the applicant, while his character review was proceeding and he was attempting to arrange restitution, misrepresented himself as an attorney in telephone calls to a bank employee. The applicant did not dispute the representation, but maintained that his motive was simply to get the employee to return his call, which she had not done earlier. Again the Board did not specifically find that the applicant's motive was as he testified; however, again, such a finding was the only one consistent with the Board's recommendation. If the motive was found to have been for some other purpose, I simply cannot imagine the Board recommending the applicant's admission.

The same observations can be made with respect to the applicant's explanation for the failure to disclose his conviction on his law school application and for the errors on his resume. More telling than the lack of explicitness of the Board's conclusions concerning these particular issues is the fact that the Board had determined that the applicant was morally fit for admission to the Bar. Explanations that were misleading, or intended to be, would not qualify the applicant for such a recommendation.

The majority, in reviewing the Board's recommendation that the applicant be admitted, gives absolutely no deference or even any consideration to the Board's factual findings regarding his intent and credibility. Instead, it questions the applicant's motives at every turn and resolves issues as to which credibility is dispositive, without any regard to the Board's determination. It refers to the applicant's alleged failure to complete restitution as a dereliction, *In the Matter of the Application of Emsean LaVinci Brown for Admission to the Bar of Maryland*, 392 Md. 44, 57, 895 A.2d 1050, 1057 (2006), notwithstanding that the Board necessarily must have found that the applicant completed restitution. It views the applicant's explanation concerning the money contained in the safe deposit box as a "complex labyrinth," and suggests, again contrary to the necessary finding of the Board, that the applicant has actually not completed restitution at all. *Id.* at 56–57, 895 A.2d at 1057. The Board's finding as reflected in its recommendation to the contrary notwithstanding, the majority characterizes as concealment the applicant's explanation for his failure to note either a gap or a prison sentence on his resume, *id.* at 58, 895 A.2d at 1058 (2006), and, in effect makes a finding of its own, "it is difficult, if not impossible, to believe that anyone could forget that he spent ten months in jail." *Id.* at 58, 895 A.2d 1058. Regarding the attorney misrepresentation issue, without any reference to what the Board must have found in that regard, the majority expresses disbelief that the applicant would have engaged in such behavior solely out of

sheer frustration. *Id.* at 59, 895 A.2d at 1058. In short, the majority directly contradicts the record made by the Board.

Rule 5(d)(3), to be sure, requires that "[p]roceedings in this Court ... be on the records made before the Character Committee and the Board." I am also aware that in *Allan S.*, this Court pointedly stated that our comment in *Character Committee v. Mandras*, 233 Md. 285, 288, 196 A.2d 630, 631 (1964), that "the Board's findings of fact are presumptively correct or at least entitled to weight where based upon the testimony of witnesses whose credibility may be in issue," predated the addition of Rule 5(d)(3) to the Rules Governing the Admission to the Bar Of Maryland. The suggestion is, of course, that the fact-finding of the Board no longer is presumptively correct.

That the proceedings in this Court are to be on the records made before the Committee and the Board does not mean, and cannot mean, that the Court may pick and choose the fact-findings to credit. It may, of course, determine whether any factual finding is clearly erroneous, but that does not equate to its being permitted to choose between conflicting findings.[11] Otherwise, the Board's recommendations would be reduced to simple suggestions and its role would be essentially meaningless. Certainly this is not the intent of Rule 5(d)(3) or of our jurisprudence on the subject.

I accept the Board's factual findings, and with those findings properly considered in the balance, I believe the Board got it right. I would admit the applicant to the Bar of Maryland.

---

**11.** *Application of Hyland,* 339 Md. 521, 539, 663 A.2d 1309, 1317 (1995) provides an example of the proper use of the records developed before the Committee and the Board, to uncover and focus on any inconsistencies, contradictions, and/ or evasiveness that the applicant's testimony before the Committee and the Board may contain.